# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 08-900

S.J. ET AL.

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

*********

APPEAL
FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20051082
HONORABLE GLENNON P. EVERETT, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Jimmie C. Peters, and Shannon J. Gremillion, Judges.

**REVERSED AND RENDERED**
**COOKS, J. CONCURS IN RESULT AND ASSIGNS REASONS**
**SAUNDERS, J. CONCURS IN THE RESULT AND ASSIGNS WRITTEN REASONS**
**GREMILLION, S. CONCURS AND ASSIGNS WRITTEN REASONS**
**PETERS, J., DISSENTS AND ASSIGNS WRITTEN REASONS**
**THIBODEAUX, CHIEF JUDGE, DISSENTS FOR THE REASONS ASSIGNED BY JUDGE PETERS AND FOR ADDITIONAL REASONS.**

Jeffery F. Speer
J. Louis Gibbens
Jason E. Fontenot
Doucet-Speer & Gibens APLC
Post Office Drawer 4303
Lafayette, LA 70502
(337) 232-0405
Counsel For Plaintiffs/Appellants S.J., et al.

L. Lane Roy
Preis, Kraft & Roy
Post Office Drawer 94-C
Lafayette, LA 70503
(337) 232-7747
Counsel For Defendant/Appellee
Lafayette Parish School Board

**COOKS, Judge.**

This court previously addressed this case upholding the trial court's grant of summary judgment dismissing the School Board based on its finding that the School Board had no duty to safeguard a child's well-being after the child leaves the school property. The Louisiana Supreme Court reversed this court and remanded the case for trial. (*See S.J. v. Lafayette Parish School Board*, 06-2862, (La. 6/29/07, 959 So.2d 884). The trial court rendered judgment after trial on the merits again dismissing the suit against the School Board finding no fault on the part of the Lafayette Parish School Board. Plaintiff timely appealed the trial court's judgment. We reverse.

## DISCUSSION OF FACTS

On November 4, 2004, C. C., a minor child twelve years of age, was sexually attacked by an unknown assailant as she walked home from Lafayette Middle School in Lafayette, Louisiana. The child's mother, individually and on behalf of her minor daughter, sued the Lafayette Parish School Board. The child was kept after school for Behavior Clinic. On a prior date, the child's mother signed a document clearly indicating that her child was not allowed to walk home. Testimony at trial from the child, her friend who was with her in Behavior Clinic that date, the assistant principal, the Behavior Clinic Facilitator, the bus driver, and teachers, established that the children had previously been informed they were not allowed to ride the late bus home when held over for Behavior Clinic. C.C. testified that an announcement reminding students of the policy prohibiting Behavior Clinic students from riding the bus home was repeated on November 4, 2004, the day of the incident. Mrs. Brenda Faye Billedeaux, the Behavior Discipline Center Facilitator at Lafayette Middle School, testified at trial "**the purpose of Behavior Clinic is not to provide you with**

**the luxury of a free ride home. I'm not obliged to find a way for Behavior Clinic students to get home."** (Emphasis added). The uncontradicted evidence further established the school had a policy in place that students such as C.C. sent to Behavior Clinic were not allowed to ride any bus home after Behavior Clinic, including the late "tutoring" bus. The trial judge noted in his reasons for judgment that "there is a confusing system relating to bus use by students in behavior clinic, and **there is no evidence that this particular student knew she could ride the bus**." (Emphasis added.)

Behavior Clinic ended that day at about 4:15P.M. According to C.C., she assumed her mother would be at school to pick her up after Behavior Clinic, as she had in the past, and then take she and her friend to Popeyes before taking her friend home. When C.C. got out of Behavior Clinic there was no one at school to pick her up. According to C.C., she went back and forth to the office and to her teacher trying to call home, to no avail. The testimony again undisputably establishes the child's mother was not informed ahead of time to allow her to make arrangements for her child to get home safely after Behavior Clinic and received no word that day that C.C. needed a ride home. The testimony also established the mother had made such arrangements in the past when she was made aware of the necessity to provide C.C. a way home from school.

S.R.C., C.C.'s classmate, testified as she was leaving the school campus, C.C. approached her and asked if she could walk with her. C.C. and her classmate left the school together at about 4:30 P.M. walking directly up the well-lit and well-trafficked street which passes directly in front of the school, to the Popeyes Fried Chicken establishment located at "four corners" across the street from the city bus stop where her friend caught the bus. This took about 15 minutes. C.C. and her classmate were

2

at Popeyes for a short time, about 20 minutes. C.C. had no money and her friend had only enough for her own bus fare.[1] C.C.'s friend crossed the street to catch the city bus and C.C. proceeded to walk home alone. It was already getting dark on this November evening when C.C. continued her walk home. C.C. described the time of day when she was attacked as "night-time." The walk home from school would normally take about an hour from the school or 45 minutes from the Popeyes establishment. Because C.C. was attacked that day, she did not arrive home until approximately 6:30 - 6:45. The police were summoned and, according to the officer's testimony, they arrived at C.C.'s home between 6:30 and 7:00 P.M. After the police questioned C.C. she was transported to the hospital by ambulance where a rape kit was administered which disclosed the presence of semen.[2]

All witnesses agreed, the area through which this 12 year old girl had to walk some two and one-half miles to get home was not safe for any child to walk through and is well known as a high crime area frequented by prostitutes, drug trafficking, and criminal activity. The school teachers, principal, assistant principal, Mrs. Billedeaux, the janitor, the school bus driver, Plaintiff and her mother, all agreed wholeheartedly and without contradiction that the area through which this child had to walk to get home on Cameron and University streets, known as "four corners," is a notoriously dangerous area through which no child, or adult, can safely traverse without exposure to harm.[3] The testimony of two Lafayette Police Officers, one in charge of public

---

[1] C.C. only had a glass of water at Popeyes as she had no money.

[2] Other than attempts by counsel, in brief and at oral argument, to cast doubt on the child's account of the incident, the physical evidence, i.e., semen on her person, adds scientific credibility to her version of the event and a finding that she was sexually molested by a male, an act our criminal statute defines as aggravated rape. La.R.S. 14:42.

[3] The defense focused during oral argument on a map it introduced and directed our attention to a possible alternate route the child could have taken to her home. There is nothing, however, in the record suggesting that the child knew the route defense counsel googled off the internet long after the incident and there is no indication in the record that any school official advised the child to take

information, also established, through both statistical data and personal knowledge, that the area through which C.C. passed to walk home was notoriously dangerous and not safe for her to walk through.

## LAW AND ANALYSIS

Louisiana law specifically mandates the School Board must provide free bus transportation to all eligible students. In the previous review of this case by the Louisiana Supreme Court on supervisory writ, Justice Johnson correctly pointed out the provisions of La. R.S. 17:158(A)(1) are "mandatory and requires that the **school board shall provide free transportation for students residing more than one mile from the school they attend.**" (Emphasis added) *S.J.,* 959 So.2d at 886. This court, in *Moreau v. Avoyelles Parish School Board,* 04-1613 (3/9/05), 897 So.2d 875, specifically held:

> No parish or city school board shall eliminate or reduce the level of transportation services provided to students as required by the provisions of this Section [17:158] except for economically justifiable reasons approved in accordance with the provisions of this Subsection by the State Board of Elementary and Secondary Education." *Moreau* at 881-882.

This court further expressly stated in *Moreau* "the concept of free education in Louisiana includes as a *primary* element the transportation to and from school." *Id.* at 883.

As this court also aptly held in *Moreau:*

> La. R.S. 17:158 provides a scheme whereby a city or parish school board is required to provide all students (1) who attend a BESE Board approved elementary or secondary school within its jurisdictional boundaries and (2) who live more than one mile from that school with free transportation to and from the school. The free transportation requirement extends to all approved schools within the jurisdictional

---

the alternate path. Moreover, this child had never walked home from school before and her choice to walk along the well lit and well traveled street in front of the school house en route to her home seems reasonable.

boundaries ... **The only permissible non-fiscal reason for denying this free transportation right to all eligible students is if the school involved discriminates against anyone on the basis of race, creed, color, or national origin.** (Emphasis added)

*Id.* at 882.

The law makes no exceptions based on whether the student is a "good" or "bad" student. The Lafayette Middle School clearly instituted a policy whereby it denied bus transportation to students placed in Behavior Clinic after regular school hours. The policy was made very clear to students including in particular, C.C. She testified that Mr. Pollan and Mrs. Reed told her, and made general announcements to the student body, that students were not allowed to ride the bus home if held over for Behavior Clinic. Particularly noteworthy is C.C.'s response when questioned at trial as to whether she thought to ask the bus driver to see if she could get a ride home on the late school bus even though she had Behavior Clinic that day. C.C. stated: "no cause I didn't want to go behind Mr. Pollan's back and get on the bus anyway. I could get suspended." As noted, even the trial judge found in his reasons for judgment **"there is no evidence that this particular student knew she could ride the bus**." (Emphasis added.) When the school chose to institute a policy contrary to the statutory requirement of free transportation it assumed a high burden of responsibility to ensure that any child denied such transportation has an alternate safe means of getting home.

## BREACH OF DUTY

The Board's reliance on a recorded message call, to the child's home telephone, with no assurance that the call was received by an adult, i.e. parent, does not discharge this duty. The defense further offered testimony to establish C.C. was afforded the opportunity to make a telephone call to her mother. Though it is unnecessary in the end for us to resolve any conflict in the testimony, we take brief

5

liberty to make the following observations. A careful review of the testimony of witnesses called by the school board discloses that none of these witnesses can directly contradict C.C.'s testimony that the office door was locked when she attempted to open it to use the phone. Despite Brenda Billedeaux's insistence that C.C. and other students used the phone in the office on November 4, 2004, after Behavior Clinic class, she actually had no first hand observation or knowledge of this alleged fact. Mrs. Billedeaux testified she was standing on the front porch of the school as the kids were coming in and out of the building "using the phone, maybe getting water or for whatever reason." She also admitted she had no independent knowledge as to whether C.C. tried to use the office phone or whether the office door was locked when C.C. attempted to enter the office. Mrs. Reed, C.C.'s Behavior Clinic teacher, also testified she knew the students used the office phone that afternoon but stated she walked past the office and waited out front. She, too could not testify to any direct observation of any student using the office phone that day. Additionally, she also testified she had no way of knowing whether or not C.C. tried to get into the office and whether the doors were locked at such time. Mr. Christopher Ferrill, a teacher working in the copy room near the office also could not actually substantiate whether C.C. tried to use the office phone or whether the doors were locked when C.C. tried to get into the office. Close scrutiny of his testimony reveals that the room he was in is about 16 feet around the corner from the principal's office and allows for view of only a section of the principal's office. Moreover, he also testified he left the copy room area at about 3:50 P.M., which was before Behavior Clinic dismissed.

Neither Mr. Pollan nor Mrs. McGee were present at school on November 4, 2004, but both offered testimony that as a general rule the office is open so long as

6

the building is open. Additionally, although one teacher testified she expressly recalled the identity of one student who she says told her he had to call home again because he forgot to tell his mom something the first time, that alleged student was not called as a witness.[4]

As Justice Johnson noted in her earlier review, the School Board's witnesses' testimony concerning whether C.C. tried to call home and whether the office door was locked when C.C. tried to enter the office to use a telephone, are not based on personal knowledge but are based on speculation relying largely on general policies. It is just as reasonable to surmise from their testimony as a whole, and C.C.'s account, that when C.C. approached the office the doors were closed. When questioned on cross examination by defense counsel, C.C. clearly equates "closed" with locked. No attempt by either defense or plaintiff's counsel was made to explore exactly what C.C. did to assure that the office doors were, in fact, locked. It is just as reasonable to find, based on C.C.'s testimony examined in whole, that she saw the doors closed and believed the doors were locked.[5]

The heightened duty imposed on the Board again requires more than an assumption by school officials that the office telephone is accessible to a Behavior Clinic student held after hours to call home for a ride. This young student was only 12 years old. By Mrs. Reed's own admission, "children will be children and you lose

_____

[4] We note as well a close examination of S.R.C.'s testimony reveals she and C.C. did not leave Behavior Class together that day nor did they leave the school building together that day. S.R.C. could not say whether the office was open when C.C. approached the office sometime after S.R.C. had passed the office. According to S.R.C. she and C.C. met up in front of the school at the corner of the sidewalk and C.C. asked her where was she going. Although the Board argues that the girls devised a plan earlier that day to walk home from school there is no evidence in the record to support his position.

[5] The defense points out that one witness testified C.C. allegedly admitted to her on tape that she had not asked Mrs. Reed to use her cell phone, but the alleged tape recording was not produced at trial although the witness testified that it was in the custody of defense counsel. It is well settled that evidence in the custody and control of a party which it does not introduce at trial raises a presumption that the evidence would not be favorable to its case.

7

them."

As Justice Johnson noted:

This case is more akin to *D.C. v. St. Landry Parish School Board*, 00-01304 (La.App.3Cir. 3/7/01), 802 So.2d 19, *writ denied*, 01-981 (La.5/25/01), 793 So.2d 169, where the court held that the scope of a school board's duty encompassed the foreseeable risk that a female student who left school campus and walked through a bad neighborhood might fall victim to one of the criminals that frequented such an area.

*S.J.,* 959 So.2d at 888.

Justice Johnson further distinguished this court's decision in *Frederick v. Vermilion Parish School Board*, 00-382 (La.App.3Cir.10/18/00), 772 So.2d 208 finding the *Frederick* decision was inapplicable to this case because that case involved older students able to make decisions independent of their parent's authority whereas "C.C. was a twelve year old middle school student." *Supra.,* at 887-888.[6]

Further, the fact that a bus was present on campus and an exception allegedly would have been made if requested is one that does not negate the Board's duty and obligation to inform C.C. that it was permissible to board the bus. C.C. did not know to ask to ride the bus. The trial judge clearly erred in finding that bus transportation was available but C.C. chose not to use that transportation. The trial judge's own written reasons for judgment, as well as the evidence, contradict his statement that "the evidence is overwhelming that transportation was available through bus service." The trial judge specifically stated: "**I note that there is a confusing system relating to bus use by students in behavioral clinic, and there is no evidence that this**

---

[6] There were only two dissents on the decision to remand the case for full trial on the merit. Justice Victory expressed no dissenting reasons. Justice Knoll dissented because she believed the bare-bone affidavits filed by defendant was insufficient to refute the School Board's allegation that bus transportation was available. We know now that the facts are undisputed that bus transportation was not provided to C.C. after Behavior Clinic. In fact, the testimony established on November 4, 2004 an announcement was made over the school intercom reminding students and C.C. that Behavior Clinic students were not allowed to ride the bus. Although Justice Weimer's concurrence hinged on the accessability of a telephone to C.C., it is clear now that he too may revisit this issue and find the Board did not satisfy its duty by providing bus transportation, a duty he viewed as paramount in his initial review.

**particular student knew she could ride the bus**." (Emphasis added.)

Justice Johnson again correctly set forth the school board's duty, in part relying on the previous decision of this court in *Gary On Behalf of Gary v. Meche*, 93-271 (La. App.3Cir.11/3/93), 626 So.2d 901:

> A school board, through its agents and teachers, owes a duty of reasonable supervision over students. LSA-C.C. art. 2320; *Wallmuth v. Rapides Parish School Bd.*, 2001-1779 (La. 4/3/02), 813 So.2d 341, 164Ed. Law Rep. 511; *Adams v. Caddo Parish School Bd.*, 25,370 (La. App. 2 Cir. 1/19/94), 631 So.2d 70, *writ denied*, 94-684 (La. 4/29/94), 637 So.2d 466. The supervision required is reasonable. Competent supervision must be appropriate to the age of the children, and the attendant circumstances. *Jackson, supra.* This duty does not make the school board the insurer of the safety of the children, and constant supervision of students is not required for educators to discharge their duty to provide adequate supervision. *Adams, supra.* [In] (sic) *Comeaux v. Commercial Union Ins. Co.*, 269 So.2d 500 (La. App. 4th Cir. 1972), the appellate court stated that, 'Reasonable, competent supervision commensurate with the age of the child and the attendant circumstances." *Id.*, at 502. [In] (sic) *Gary On Behalf of Gary v. Meche*, 626 So.2d 901 (LA. App. 3 Cir. 1993), **the court held that a school board's duty to reasonably supervise young students is not restricted to school hours, and that school boards must have a policy to ensure that young children do not leave the school unattended.**" (Emphasis added.)

*S.J.,* 959 So.2d at 886.

In addressing breach of duty, Justice Johnson further correctly explained:

> Generally, breach of a duty is the failure to exercise reasonable care under the circumstances. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law Sect. 6-1, at 139 (1996). The duty of reasonable supervision is generally always present when a child is on campus during regular school hours, is waiting on the school's ground for a school bus, or **is participating in an after school sanctioned activity such as band rehearsal or sport related practices**. (Emphasis added.)

*S.J.,* 959 So.2d at 886.

Simply put, the school board failed to meet its duty of supervision owed to C.C. under the circumstances.

**DAMAGES**

C.C. and her mother testified C.C. was greatly affected by the rape. Her grades dropped, she was scared to go outside, and when she did go outside she would hear things and was afraid. C.C. developed feelings of self loathing and felt no one loved her. She would come home from school crying every day. The children at school harassed and teased her telling her she was pregnant and asking if she enjoyed what happened to her. She felt even the faculty did not treat her much better. C.C. had to move schools twice after the rape. This court has clearly held that sexual molestation of a minor child always results in harm to the child and damages are presumed. In *Doe v. Mires*, 99-65, p. 5 (La. App.3 Cir.6/2/99) 741 So.2d 842, 845, quoting *Smith v. Perkins*, 94-1270, pp. 8-9 (La. App. 4 Cir. 12/28/94) [,] 648 So. 2d 482, 486, *writ denied*, 95-267 (La. 3/24/95)[,] 651 So.2d 292 we held: "The sexual molestation of a child is certainly a deliberate and intentional act, and the emotional and physical damage is such a fundamental and natural consequence of the molestation that any predator must be held to realize that damage will result." Defendant offered no evidence to refute C.C. and her mother's testimony in this regard.

The only medical bill introduced into evidence is the bill for Acadian Ambulance totaling $345.64. Although medical records from Lafayette General Medical Center were introduced as evidence, no billing records were introduced and there is no information provided as to the cost of C.C.'s medical care either through testimony or record evidence. Although Plaintiffs are entitled to recover medical costs, such an award can only be based upon evidence of record. Therefore, based on the evidence introduced at trial, Plaintiffs are entitled to an award of $345.64 in special damages. As to general damages, we award C.C. general damages in the amount of $100,000.00, and we award S.J. $20,000.00 general damages, under the

provisions of La.Civ.Code art. 2315.6. However, we are required to assess the comparative fault of all responsible parties in causing harm to C.C. and her mother. In doing so, as statutorily mandated, we assign the actual perpetrator of the crime 75% fault and C.C. 5% fault. We assign 20% fault to the Lafayette Parish School Board. Accordingly, judgment is hereby rendered in Plaintiffs' favor against the Lafayette Parish School Board in the proportionate amounts equal to the fault herein assigned. All costs of court and all costs of this appeal are assessed against Defendant, Lafayette Parish School Board.

**REVERSED AND RENDERED**
**COOKS, J. CONCURS IN RESULT AND ASSIGNS REASONS**
**SAUNDERS, J. CONCURS IN THE RESULT AND ASSIGNS WRITTEN REASONS**
**GREMILLION, S. CONCURS AND ASSIGNS WRITTEN REASONS**
**PETERS, J., DISSENTS AND ASSIGNS WRITTEN REASONS**
**THIBODEAUX, CHIEF JUDGE, DISSENTS FOR THE REASONS ASSIGNED BY JUDGE PETERS AND FOR ADDITIONAL REASONS.**

11

S.J., ET AL.

VERSUS

LAFAYETTE PARISH SCHOOL BOARD


**THIBODEAUX, Chief Judge, dissenting for additional reasons.**


I dissent for the reasons expressed by Judge Peters and for this additional reason. It is axiomatic that under Louisiana's duty-risk analysis, a plaintiff has to prove five elements: duty; breach of duty; cause-in-fact; legal cause; and, damages. Legal cause focuses on whether a defendant owed a duty to *this* plaintiff under *these* circumstances. Even assuming the existence of a duty, did the duty of the Lafayette Parish School Board extend to protect C.C. and S.J. from the harm they allegedly suffered from the alleged occurrence, i.e., rape? *See Hill v. Lundin & Assocs., Inc.*, 256 So.2d 620 (La.1972). It really boils down to a test of foreseeability. In my view, legal cause simply does not exist in this case.

I, therefore, dissent.

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

08-900

S.J. ET AL.

VERSUS

LAFAYETTE PARISH SCHOOL BOARD

COOKS, J. CONCURS

While I concur in the results because it provides a measure of relief for the harm caused to C.C. and her mother, I disagree with the majority decision to assign any degree of fault to C.C. As Justice Johnson concluded, no amount of fault can be attributed to C.C., a child only 12 years of age. In fact, I note that C.C. acted reasonably and very responsibly in asking a friend to walk with her as far as that friend was able to go in order to be more secure walking home from school. Likewise it is reasonable that S.R.C. might have been a little hungry after being detained in Behavior Clinic all afternoon and desired to stop at Popeyes for a bite to eat. I further note that C.C. had never before walked home from school and was unfamiliar with any alternate internet map route defense counsel offered in court.

The very reason this child was statutorily entitled to a free school bus ride home is because she lived approximately two and one-half miles away from school. I believe it is error to place any significance on the fact that the rape of this child took place more than a mile from school and more than an hour after school. The rape occurred more than an hour after C.C. left school walking home on a walk that would take over an hour even if she had not stopped for a glass of water. As to any discussion or misplaced reliance on whether C.C., in fact, was afforded the opportunity to use a telephone after Behavior Clinic ended to call her mother, who

1

should have already been notified properly by the school that C.C. was being held over for Behavior Clinic. This is nothing more than a "red herring". This child, as every child who lives more than one mile from school, is entitled to free bus transportation and the School Board is statutorily mandated to provide such transportation **without exception** in this instance. The School Board breached its duty to C.C. and undeniably knew and admits they were sending this child walking home through a notoriously dangerous neighborhood.

I believe the greatest degree of fault for the rape of this little girl lies with the School Board. The child's mother instructed in writing that her daughter was not allowed to walk home. No effort was made by the school to ensure C.C. knew there existed an alleged "un-communicated" exception to the announcement on the very day of the incident that she could not ride the bus. I believe the supreme court's decision in *Campbell v. Department of Transp. & Dev.*, 94-1052 (La. 1995), 648 So.2d 898 is instructive as to the proper apportionment of fault. Relying on the rationale in *Campbell,* this court in *Caruthers v. Department of Transportation And Development,* 97-1450 (La. App. 3 Cir. 4/15/98), 711 So.2d 420 noted:

> Under our theory of negligence, the crucial consideration is whether the conduct in question is a cause-in-fact of the resulting harm or injuries. (Citing *Campbell*) *It is irrelevant whether the conduct was the primary cause of the accident.* Liability may be imposed upon a party, such as DOTD, provided its conduct contributed to causing the injuries sustained by the victim plaintiff. If the party's conduct indeed contributed to the plaintiff's harm, **fault will be apportioned to that party according to the extent of the causal relation between the conduct and the damages claimed.** (Emphasis added.)

I believe the causal relation of the school personnel's conduct in unlawfully denying C.C. free bus transportation home from school, compounded by their breach of duty to supervise her and to make sure she had secured a safe alternate means home, coupled with their admitted knowledge of the notoriously dangerous

2

neighborhood through which C.C., (a 12 year old girl,) had to walk, created the greatest risk that C.C. would be harmed and created the opportunity for her assailant to attack her. While I agree the assailant has some degree of fault, I believe the lions share of fault should be assessed against the School Board. I would therefore assess 25% fault to the unknown rapist, 75% fault to the School Board, and 0% fault to the 12 year old child.

I disagree with the quantum of damages. I believe the minimum amount of general damages which should be awarded the 12-year-old child is $200,000.00 and $40,000.00 to her mother.

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

SANDRA JOSEPH, ET AL

V.

LAFAYETTE PARISH SCHOOL BOARD, ET AL

**SAUNDERS, Judge, concurs in the result and assigns written reasons.**

Initially, I would like to note that our Supreme Court's analysis in its prior disposition of this case was based upon affidavits that made it appear that the School Board provided C.C. the opportunity of using the late bus. After this point was hashed out at trial, it is clear that this was not the case. It is my opinion that La.R.S. 17:158(A)(1) imposes a duty on the School Board in favor of C.C.

Louisiana Revised Statutes 17:158(A)(1) provides:

Except as provided by Subsection H of this Section and in accordance with the requirements of Subsection F of this Section, each parish and city school board shall provide free transportation for any student attending a school of suitable grade approved by the State Board of Elementary and Secondary Education within the jurisdictional boundaries of the parish or school board if the student resides more than one mile from such school.

There is no dispute that C.C. lived more than one mile from school or that the behavior clinic was a school activity. There is also no dispute that the trial court reached a factual conclusion that C.C. understood that she could not ride the late bus. The trial court found that "there is no evidence that this particular student knew she could ride the [late] bus." This factual finding is sufficiently supported by the record as there is an abundance of testimony to make this finding reasonable, inclusive of not only the testimony of C.C., but of her mother, that

they both understood that the late bus could not be ridden by students required to attend the behavior clinic. As such, I think that the School Board breached its duty to provide C.C. with transportation under La.R.S. 17:158(A)(1).

The next issue is the question of foreseeability. This question requires that we determine the duty, if any, that the School Board has to its students to protect them from the criminal activity of third parties. Here, I think it important to note Justice Weimer's concurrence, joined by Justices Kimball and Traylor in our Supreme Court's earlier analysis of this case. I find it telling when he discusses the factual issue of whether C.C. was allowed to use the telephone where the following is stated: "Allowing telephone access imposes virtually no burden on the school board and costs the school board nothing, yet protects the child from the potential of being exposed to a risk of harm."

This language is similar to what was used by our Supreme Court in formulating its balancing test in *Posecai v. Wal-Mart Strores, Inc.*, 99-1222 (La. 11/30/99), 752 So.2d 762. I read this language to say that the School Board has the same duty, or at least a similar duty, toward its students as that of business owners to protect its patrons from crimes committed by third parties. In *Posecai*, our Supreme Court provided the following balancing test:

> With the foregoing considerations in mind, we adopt the following balancing test to be used in deciding whether a business owes a duty of care to protect its customers from the criminal acts of third parties. The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. *The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business*. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the

burden of establishing the duty the defendant owed under the circumstances.

*Posecai*, 752 So.2d 768 (emphasis added).

It is hard to envision that the School Board would have a lesser burden than that of business owners under the *Posecai* test since students, unlike patrons, are mandated to attend school. With this test in mind and applying it to the facts of this case, I note that, while the foreseeability in this case is not great, the gravity of the possible harm is indeed great. Further, as was the case with the telephone call discussed by Justice Weimer, providing that a child in the behavior clinic can ride the late bus costs the School Board virtually nothing, as the bus was already at the school and provided other students with transportation on that particular evening. Thus, given the high gravity of this particular harm and the low burden and statutory mandate on the School Board, I find that the school board's duty to provide transportation encompasses the risk of C.C. being raped while walking home.

As a result, I feel that the trial court erred when it concluded that "the plaintiff has failed to carry her burden that the [Lafayette Parish School Board] was negligent at all." The School Board's breach of its statutorily imposed duty to C.C. was not only a cause-in-fact of C.C.'s harm, it was also foreseeable that this breach could result in some harm. Given the minimal inconvenience to the School Board, i.e. that it not violate its statutory duty of providing transportation and the balancing test of *Posecai*, I also conclude that the harm was foreseeable.

With respect to whether C.C. was allowed to use the telephone in the principal's office or the personal phone of the teacher, I feel that the record suggests she could have used a phone to call her mother for a ride. Nevertheless, I

feel that this specific issue deals only with the allocation of fault between the School Board and C.C. for the resulting harm.

In this regard, I would again like to note Justice Weimer's concurrence where it states, "[m]atters such as dangerous traffic conditions or neighborhoods may make that choice by the child [to walk home] imprudent. A school board employee exercising reasonable supervision would not require a child to make such a choice." *S.J. v. Lafayette Parish School Bd.*, 06-2862, p. 3 (La. 6/29/07), 959 So.2d 884, 890. C.C. should be allocated a percentage of fault. It should be a small percentage. I agree with the allocation to C.C. of five percent fault. I also agree that the perpetrator of the crime be assessed with seventy-five percent of the fault, with the remaining twenty percent allocated to the School Board.

Finally, I feel that an award of one hundred thousand dollars is appropriate for the general damages suffered by C.C. in this case with reductions for the allocations of fault to the respective parties. Further, with respect to S.J., I feel that an award of twenty thousand dollars is warranted.

S.J., ET AL.

VERSUS

**LAFAYETTE PARISH SCHOOL BOARD**

PETERS, J., dissenting.

The plaintiff brought this personal injury suit, individually and as the tutor of her minor daughter, to recover from the Lafayette Parish School Board (School Board) for the damages she and her daughter are alleged to have incurred as a result of her daughter's decision to walk home from school on the afternoon of November 4, 2004. She claims that while walking home from the Lafayette Middle School in Lafayette, Louisiana, on that date, her daughter was sexually assaulted by an unknown assailant. The plaintiff appeals the trial court's rejection of her claims against the School Board, and the majority proposes to reverse that determination, although there is no majority on any liability issue other than the end result.

I disagree with the plurality's interpretation of the factual record as well as most of the legal analysis found in the four opinions written by the three judges who form the plurality. It naturally follows that I also disagree with the award of any damages to the plaintiff. Because the plurality agrees only on the result reached and not on the methodology applied in reaching that result, my dissent cannot be based on one or two points of disagreement. Instead, I find it necessary to set forth the particulars of the entire record in order to explain why I believe that the analysis and result is wrong in all four opinions.

## STANDARD OF REVIEW

Because of the way in which the plurality reaches the decision to reverse, in discussing the standard of review applicable, we should remind ourselves that Louisiana is unique in that courts of appeal review both law and facts. La.Const. art. 5, § 10(B). Furthermore, it is well established that a trial court's findings of fact are subject to the manifest error/clearly wrong standard of review. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* at 882. In that regard, "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Specifically, "[i]n applying the manifestly erroneous—clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues *de novo*." *Id.* The credibility determinations of the trier of fact are subject to the strictest deference under the manifest error/clearly wrong standard. *Theriot v. Lasseigne*, 93-2661 (La. 7/5/94); 640 So.2d 1305. An independent *de novo* review by the appellate court is proper only "[w]here one or more trial court legal errors interdict the fact-finding process" and "the record is otherwise complete." *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252, p. 7 (La. 2/20/95), 650 So.2d 742, 747.

All four opinions simply accept as fact the assertions of the plaintiff and her daughter and ignore the trial judge's factual findings. Thus, the plurality disregards this long-established standard of review that appellate courts are required to apply.

2

This failure to apply the appropriate standard of review results in decisions not supported by the law or the jurisprudence.

## LAW PERTAINING TO NEGLIGENCE ACTIONS IN GENERAL

Questions of liability for negligent acts are evaluated using a duty-risk analysis. *Daye v. Gen. Motors Corp.*, 97-1653 (La. 9/9/98), 720 So.2d 654. Under the duty-risk approach, the "[p]laintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached." *Id.* at 659. The plaintiff's failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095 (La. 3/10/06), 923 So.2d 627. The duty analysis is a legal rather than factual one and is the threshold issue in any negligence action. *Id.* Cause-in-fact is a factual question to be determined by the factfinder and subject to the manifest error standard of review. *Benjamin ex rel. Benjamin v. Hous. Auth. of New Orleans*, 04-1058 (La. 12/1/04), 893 So.2d 1.

Again, as was the case in considering the scope of review, none of the plurality mention the duty-risk analysis. However, application of this analysis to the evidence presented mandates an affirmation.

## DUTY IMPOSED ON THE SCHOOL BOARD

The duty imposed on a school board with regard to children in their care is a long-established rule of "reasonable supervision." *Wallmuth v. Rapides Parish Sch. Bd.*, 01-1779, 01-1780, p. 8 (La. 4/3/02), 813 So.2d 341, 346. That "reasonable supervision" duty is governed by one of two Civil Code articles: either by

3

La.Civ.Code art. 2320[1] or La.Civ.Code art. 2315. The latter article provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Our supreme court has held that "liability under each statute requires that the School Board breach its duty of reasonable supervision over its students." *Wallmuth*, 813 So.2d at 347. In that opinion, the supreme court stated that the correct standard of liability under either La.Civ.Code art. 2320 or La.Civ.Code art. 2315 is as follows:

> A school board, through its agents and teachers, owes a duty of reasonable supervision over students. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. This duty does not make the school board the insurer of the safety of the children. Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision.
>
> Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident. . . . Furthermore, before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised.

*Id.* at 346 (citations omitted).

Thus, the duty we must analyze in this matter is whether the School Board provided reasonable supervision to the plaintiff's daughter in proportion with the daughter's age and the accompanying circumstances.

The record establishes that the Lafayette Middle School effected notice of a child's required participation in Behavior Clinic through written notice to the child and an automated telephone call to the child's home the night before his or her

---

[1]Louisiana Civil Code Article 2320 relates to the liability of a school board for the damage caused by their students, and is not applicable to the matter now before us.

4

participation in the Behavior Clinic. Additionally, it has a policy that no child will be left alone on campus at the end of the day. To that end, the principal's office remains open after school to afford any child access to a telephone to call for transportation. In fact, the office is only locked when the janitor—the last person to leave the campus in the afternoon—locks it as he leaves for the day. Although the policy concerning the use of the tutoring student bus is somewhat muddled, the evidence is uncontradicted that a public bus stop is located directly in front of the school. Finally, every teacher or administrator who testified on the "no child left on campus" policy made it clear that, when necessary, children would be transported home by teachers or other responsible adults and, if necessary, would be given money for public transportation. It is these policies that are subject to our review.

Despite the plurality's statement to the contrary, the jurisprudence contains no decision that is remotely factually similar to this matter. The general rule in this court has been that allowing a student to leave the campus *during regular school hours in violation of the school's established policy* is a violation of the duty of reasonable supervision. *Peters v. Allen Parish Sch. Bd.*, 08-323 (La.App. 3 Cir. 11/5/08), 996 So.2d 1230 and *D.C. v. St. Landry Parish Sch. Bd.*, 00-1304 (La.App. 3 Cir. 3/7/01), 802 So.2d 19, *writ denied*, 01-981 (La. 5/25/01), 793 So.2d 169.[2] Courts have also held that the duty of reasonable supervision includes preventing a six-year-old from leaving the school grounds unattended at the end of the school day. *Sutton v.*

[2]Judges Cooks and Gremillion suggest that the *D.C.* decision supports their position. Having written that decision, I can say that it is clearly distinguishable. In that case, the school allowed a twelve-year-old seventh grade student to check herself out of school *during school hours, in violation of its own policy, and without notifying the parents.* The child was sexually molested while walking home. In finding liability in that case, this court clearly distinguished that case from *Jackson v. Colvin,* 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, *writ denied* 99-228 (La. 3/19/99), 740 So.2d 117, where a child was struck by a vehicle while walking home after attending an *after-school* activity. In *Jackson*, this court had applied the long-established rule that school boards are not the insurers of the children in their care.

*Duplessis*, 584 So.2d 362 (La.App. 4 Cir. 1991) and *Gary on Behalf of Gary v. Meche*, 626 So.2d 901 (La.App. 3 Cir. 1993). However, the duty of reasonable supervision changes as the student grow older. This court has held that a school board is not required to ensure that a nine-year-old student who is walking home after an extracurricular activity does not leave the school grounds alone. *Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, *writ denied* 99-228 (La. 3/19/99), 740 So.2d 117. Additionally, this court has held that the duty of reasonable supervision does not include preventing an eleven-year-old sixth grade student who is supposed to ride the bus from walking home. *Domingue v. Lafayette Parish Sch. Bd.,* 03-895 (La.App. 3 Cir. 6/16/04), 879 So.2d 288, *writ denied* 04-1803 (La. 10/29/04), 885 So.2d 588. In *Domingue* this court distinguished *Sutton* and *Gary,* stating that "[t]he level of supervision required for six-year-olds versus eleven and twelve-year-olds cannot be compared." *Id.* at 296.

Without saying as much, two of the judges in the plurality would make school boards the insurer of the safety of every child; overrule the holdings in *Wallmuth*, *Jackson*, and *Domingue*; and expand the holdings of *Peters* and *D.C.*

### FACTUAL ANALYSIS

In this case, the plurality points to no legal error on the part of the trial court that would have interdicted the fact-finding process, yet all three judges seem to perform a *de novo* review of the record. The result is that none of the three judges gives *any* deference to the trial court's findings of fact, much less the strict deference required by the jurisprudence under the manifest error/clearly wrong standard of review. The starting point of any appellate review is a review of the factual findings of the trial court. The four plurality opinions simply skip this step, accept as fact the

6

testimony of C.C., the plaintiff's daughter, and conclude that there are no disputed facts in this litigation. I respectfully disagree with the review procedure applied as well as the conclusion reached.

What is not disputed is that during the 2004-2005 school term, the Lafayette Middle School operated both a tutoring program and a disciplinary program after school on Tuesdays and Thursdays. C.C., who is the plaintiff's daughter, was a regular participant in the tutoring program and a sometimes participant in the disciplinary program known as the Behavior Clinic. Both programs began immediately after the end of the school day[3] and lasted until around 4:00 p.m. The Lafayette Middle School provided a full-sized school bus to take the tutoring program children home, but, as a general rule, the Behavior Clinic children were instructed that they could not ride this bus.[4] Instead, they were required to make transportation arrangements in advance of their Behavior Clinic participation or immediately after the Behavior Clinic.

It is also undisputed that, on Tuesday, November 4, 2004, C.C. participated in the Behavior Clinic rather than the tutoring program. She was familiar with the program, having already been required to attend twice that school year.[5] Although she knew she would be required to participate that afternoon, she made no mention of participation to her mother as she left home that morning. Her mother had received notification of C.C.'s participation in the Behavior Clinic by the automated telephone call on both occasions in the past and had made arrangements to pick up her daughter

---

[3]The evidence presented establishes that the regular school day concluded at 2:15 p.m.

[4]This ill-conceived policy will be discussed more fully later in this dissent.

[5]In fact, her participation on November 4, 2004, was a makeup session because she had failed to attend the Behavior Clinic the week before.

7

on each occasion. On the afternoon of November 4, 2004, the plaintiff did not pick up her daughter, nor did she make arrangements for her daughter to be picked up by a responsible party.

The record also establishes that after the Behavior Clinic, C.C. left the campus with a fellow student, S.R.C., and walked to a nearby Popeyes fast food establishment. S.R.C. left C.C. at Popeyes and caught a city bus to travel to her home. Sometime thereafter, C.C. had a sexual encounter with someone.[6] It is this sexual encounter that constitutes the basis for the plaintiff's claim for damages. The remainder of the facts surrounding the happenings on the afternoon of November 4, 2004, are in dispute.

### Factual Record Relative to Telephone Access

On appeal, the plaintiff's theory for the School Board's liability hinges primarily on the argument that C.C. was unable to use the school telephone in the principal's office to call home because the door to the office was locked, and that Gladys Marie Reed, the Behavior Clinic supervising teacher, denied C.C.'s subsequent request to use her [Ms. Reed's] personal cellular telephone to call home. In its reasons for judgment, the trial court concluded factually that "[t]he evidence is overwhelming that . . . the use of a telephone was made available to the juvenile on the day in question." In its reasons for judgment, the trial court also concluded factually that "[s]tudents were also questioned and confirmed the phone could be accessed." In reaching these factual conclusion, the trial court made credibility determinations on the issue of telephone availability and resolved this issue in favor of the School Board.

---

[6]The presence of semen in C.C.'s vagina makes this fact undisputable. However, that fact alone does not establish the nature of this sexual encounter.

In her lead opinion, Judge Cooks does not mention the trial court's factual conclusions on this issue. Instead, she accepts C.C.'s testimony as fact and concludes C.C. established that no telephone was available to her on the afternoon of November 4, 2004.[7] My review of the record reveals that the other testimony overwhelmingly supports the trial court's factual determination on this issue and that Judge Cooks erred in not giving the proper deference to the trial court's factual findings on this issue and in replacing the well-reasoned factual determinations of the trial court with her own.

C.C. testified that immediately after the Behavior Clinic, she went to the principal's office on the first floor of the school to telephone her mother, but when she reached the office, she found the office door locked. According to C.C., she returned to the Behavior Clinic room, which is located on the third floor of the school, to ask Ms. Reed for the use of Ms. Reed's cellular telephone to call her mother. She testified that Ms. Reed refused to allow her to use the telephone and she then went outside and met with her friend, S.R.C. Although the tutoring student school bus was still in front of the school, she walked with S.R.C. to a nearby Popeyes fast food establishment.

C.C.'s testimony was the only evidence presented by the plaintiff on this pivotal issue of the availability of a telephone. In response, the School Board called a number of witnesses who disputed C.C.'s version of the facts on this issue. However, Judge Cooks does not mention this testimony, discounting its significance with the comment that "[a] careful review of the testimony of witnesses called by the

---

[7]Both Judge Saunders and Judge Gremillion disagree with Judge Cooks on this issue. Thus, four of the five judges on this panel agree that the trial court did not err in concluding that C.C. did have access to a telephone to call her mother for transportation.

school board discloses that none of these witnesses can directly contradict C.C.'s testimony that the office door was locked when she attempted to open it to use the phone."  Judge Cooks hypothesizes that

> [W]hen C.C. approached the office the doors were closed. When questioned on cross examination by defense counsel, C.C. clearly equates "closed" with locked. No attempt by either defense or plaintiff's counsel was made to explore exactly what C.C. did to assure that the office doors were in fact locked.  It is just as reasonable to find based on C.C.'s testimony examined in whole is that she saw the doors closed and believed the doors were locked.

This hypothesis is not supported by C.C.'s actual testimony.  On cross-examination, the only questioning concerning the office doors reads as follows:

> Q      And you told us that the doors were closed.
> C.C.  *That's right.  They were locked.*
> Q     *Did you check both doors?*
> C.C.  *Yes.*
> Q      Who was with you when you checked the doors?
> C.C.  I was by myself.

(Emphasis added.)

C.C.'s testimony unequivocally established that she physically checked the doors and found them locked.  Absent any evidence other than C.C.'s testimony, Judge Cook's hypothesis would still be incorrect.  Further, the School Board's evidence on this issue clearly discounts the hypothesis as the following summary of that evidence establishes.

Ms. Reed, a twenty-four-year educator, testified that at the end of each Behavior Clinic session, she requires all the participating students to properly stack the material they have been working on, instructs them to exit the building but not to use the bathroom or get water,[8]and instructs them to use the telephone in the office

---

[8]Ms. Reed indicated this instruction was to facilitate the children leaving the building rather than congregating in the bathroom or around the water cooler.

immediately before leaving the building if needed. According to Ms. Reed, the principal's office is open after dismissal of the Behavior Clinic to accommodate those students who must make arrangements for transportation. She affirmatively testified that the office was open on November 4, 2004, stating that as she left the building, she observed several children using the telephone in the principal's office. When she left the premises approximately ten minutes later, the tutoring bus was still parked in front of the school and there were still children waiting for rides. However, she did not see C.C.[9]

Ms. Reed specifically denied that C.C. ever asked to use her cellular telephone, and testified that had C.C. asked, she would certainly have allowed her to telephone her mother. In fact, according to Ms. Reed, a few days after this incident, C.C. apologized for having lied to others about Ms. Reed's alleged denial of the use of her cellular telephone.

Christopher Ferrill, a twelve-year educator, testified that after school on November 4, 2004, he made a number of copies at the office near the principal's office and observed that the principal's office was open. In fact, during that afternoon, he used the office telephone to call his wife and was around the office when the tutoring and Behavior Clinic classes ended. Additionally, he testified that the office is always open until the janitors lock the building after everyone has left. Although his time-line is inconsistent with the timing for the end of the tutoring classes and Behavior Clinic (Mr. Ferrill testified that he made the copies between 3:00 p.m. and 3:20 p.m.) Ms. Reed testified that she observed Mr. Ferrill making the copies as she left the building. His testimony, coupled with Ms. Reed's observation of his presence after the Behavior

_____

[9]Ms. Reed testified that C.C. and S.R.C. were the first to leave the Behavior Clinic.

11

Clinic students were released, gives credibility to a finding that he was present later than 3:20 p.m. and simply was incorrect in his time-line testimony.

Monique Boute McGee, a thirteen-year educator and the Assistant Principal at Lafayette Middle School, testified that C.C. came to her two days after the incident at issue and told her that she never asked Ms. Reed for the use of her cellular telephone. Ms. McGee is the person who called Ms. Reed in to accept C.C.'s apology. Although Ms. McGee was not present at school after 3:00 p.m. on November 4, 2004, she testified that the principal's office is open every day until the janitor locks up, and that the telephone is available to the students staying after school. On November 5, 2004, after hearing of the alleged attack on C.C., Ms. McGee questioned a number of the Behavior Clinic students who were present the day before and found no complaints concerning the use of the telephone.

Brenda Faye Billedeaux, a thirty-seven-year educator and the Behavior Discipline Center facilitator, testified that on November 4, 2004, the Behavior Clinic ended at 4:00 p.m. and the tutoring sessions ended at 4:15 p.m. At approximately 3:55 p.m., Ms. Billedeaux went through the principal's office and made an afternoon announcement, then left out of the front door to the office to ensure that the door was propped open and the phone on the counter. She subsequently observed a number of students using the telephone. On that day, she was on the campus until 4:35 p.m., waiting for another student to be picked up.

Ronald Pollan, a thirty-five-year educator and the Principal at Lafayette Middle School, testified that it is school policy for the principal's office to remain open in the afternoon after school to allow children stranded on campus to telephone for transportation. While he was not present on the afternoon of November 4, 2004, he

conducted interviews with other students on November 5, 2004, and found no evidence to suggest that the policy was not followed on the day before.

Randy Fitzgerald Andrus, the custodian or janitor on duty on November 4, 2004, testified that he generally remains on campus from 9:00 a.m. until 6:00 p.m., he checks the building to make sure everyone has left, he then locks the office and the building, and he is the last to leave each day. According to Mr. Andrus, this procedure was in effect on November 4, 2004, and the office was open that afternoon after school until he left for the day.

S.R.C. acknowledged in her testimony that Ms. Reed dismissed the class just as Ms. Reed had explained in her testimony. S.R.C. specifically remembered Ms. Reed instructing any student who needed to call a parent to go directly to the office. She recalled the door to the office being open, the school secretary being present in the office, and other students using the office telephone.[10]

The end result of Judge Cook's analysis is to discount the trial court's factual finding on this issue by accepting C.C.'s testimony as accurate and questioning the veracity of the professional educators who have a combined 121 years of teaching experience, as well as that of Mr. Andrus, who is the individual responsible for inspecting the building at the end of the day. Such a determination ignores the clear preponderance of the evidence and, more importantly, ignores the manifest error/clearly wrong standard of review.

As previously stated, both Judge Saunders and Judge Gremillion disagree with Judge Cooks on this pivotal issue. Judge Saunders concludes that "the record suggests that [C.C.] could have used a phone to call her mother for a ride." Judge Gremillion

---

[10]When questioned concerning the presence of the secretary and other students using the telephone, S.R.C. stated "I think so." However, she was clear that the office door was open.

states that he agrees "with the trial court conclusion that this twelve-year-old girl certainly had access to at least one telephone before she left the school grounds." In fact, in this regard, Judge Gremillion goes on to say that "[t]here is no one to blame but her for her failure to call someone."

### *Factual Record Relative to Bus Service*

In its reasons for judgment, the trial court factually concluded that "[t]he evidence is overwhelming that transportation was available through bus service." The three plurality judges do not mention the trial court's factual determination on this issue. Instead, they simply conclude that C.C. could not ride the tutoring student bus, and, therefore, the School Board failed to provide transportation. However, this conclusion is not supported by the record and ignores the trial court's factual determination that even if C.C. did not ride the tutoring student bus, public bus service was also available to her.

I do agree that Lafayette Middle School's policy concerning the use of the tutoring student bus was, as suggested by the trial court in its reasons for judgment, "confusing" given its application. In fact, I would go further and suggest that it was ill conceived and should be changed for the future.

Ms. Billedeaux admitted to being the architect of this policy, asserting that it was put in place to guarantee the tutoring students a ride home, but not to totally deny the Behavior Clinic children a ride. She testified that after all tutoring students were accommodated, the remaining space on the bus was provided to the Behavior Clinic students. However, she acknowledged that the policy was not articulated to the students in that fashion, and that an announcement was made to the effect that Behavior Clinic students were not allowed to ride the bus. She suggested that part of

14

the intent of the stated policy was to make it plain to the Behavior Clinic students that she was not obligated to find them a way home and, thus, transportation difficulties would be a part of their punishment for breaking the rules.

Given the mixed signals from the school administration, I would agree with the plurality opinions that one could conclude that C.C. understood she could not ride the tutoring student bus. However, the trial court did not base its factual conclusion on the tutoring student bus alone. The reasons for judgment conclude that "transportation was available through *bus service*." (emphasis added). What the plurality ignores is that public transportation was available. Furthermore, the remainder of the evidence overwhelmingly establishes that a child in need of a ride would be accommodated regardless of Ms. Billedeaux's communicated policy or the availability of public bus transportation.

Ms. Reed testified that any transportation problem would always be addressed, and that she had driven children home in the past. Additionally, she made it clear that a teacher is always present until every student has left the campus. Mr. Ferrill testified that he had helped children find transportation in the past, and had driven some home as well. Ms. McGee was not even aware of the problem with the tutoring student bus and made it clear that children would be accommodated, as did Ms. Billedeaux. In fact, Ms. Billedeaux testified that not only had she brought children home personally, but that the school personnel had enlisted the help of local law enforcement officers to provide transportation in some instances. Mr. Pollan confirmed the testimony of the other teachers, and both he and Ms. Billedeaux testified that because C.C. was a regular tutoring student she had the right to ride the tutoring student bus even though

she was attending the Behavior Clinic rather than tutoring class on November 4, 2004. According to Mr. Pollan, a student is never left stranded on campus.

The testimony of Peter A. Arceneaux, the driver of the tutoring student bus, supported the stated school policy that, when space is available, no Behavior Clinic student would be denied a ride on his bus. According to Mr. Arceneaux, the only thing the school wished to do with its stated denial policy was to require the Behavior Clinic students to attempt to contact their parents first. If that failed, the bus was available. Mr. Arceneaux testified that space was available on November 4, 2004.

The most damaging testimony to the plaintiff's case is that of S.R.C. She established without question that there was a city bus stop directly in front of the school. She was familiar with this fact because she normally caught the public bus at that stop after school. Additionally, although C.C. claimed in her testimony to have no money, Mr. Pollan testified that, in support of the school policy that no child would be left on campus, the office or one of the teachers would have provided her with money to take the public transportation offered.

The evidence is also clear that even after she left the campus, C.C. had access to transportation. C.C. testified that when she left campus with S.R.C., she knew that S.R.C. had only fifty cents, and that was required for her ride home. Yet, C.C. also testified that when they arrived at Popeyes, S.R.C. purchased food and somehow still had fifty cents to ride the bus. However, S.R.C. did not support C.C.'s testimony on her lack of money. S.R.C. testified that, not only did she have adequate money to purchase food at Popeyes and ride the public bus, she had enough to loan C.C. the bus fare and offered to do so. According to S.R.C., C.C. responded that she wanted to "wait" at Popeyes. S.R.S. indicated that she did not know what C.C. was waiting for.

16

Both Judge Cooks and Judge Saunders limit their analysis of the transportation issue to the use of the tutoring student bus. In doing so, they conclude that the Lafayette Middle School policy in this regard violates the School Board's duty under La.R.S. 17:158 to provide free bus transportation to children living more than one mile from the school. Judge Cooks suggests that this statute somehow changes the School Board's duty from one of "reasonable supervision" to one of a "high burden of responsibility," a requirement not heretofore recognized by statute or jurisprudence. Specifically, Judge Cooks holds that "[w]hen the school chose to institute a policy contrary to the statutory requirement of free transportation it assumed a high burden of responsibility to ensure that any child denied such transportation has an alternate safe means of getting home." Judge Saunders finds that La.R.S. 17:158 imposes a duty on the School Board to provide students with transportation home and that this duty "encompasses the risk of C.C. being raped while walking home."

Both Judge Cooks and Judge Saunders ignore the trial court's factual finding that numerous alternate means of arriving home safely were available to C.C. Furthermore, they misapply the statute. Louisiana Revised Statutes 17:158 does require that a school board provide free transportation to students living more than one mile from the school, but does not create a duty for a school board to insure a child's safe return home. Our supreme court has held that the violation of a statute gives rise to civil liability only when "the prohibition in the statute is designed to protect from the harm or damage which ensues from its violation." *Laird v. Travelers Ins. Co.*, 267 So.2d 714, 717 (La.1972). Louisiana Revised Statutes 17:158 is an accommodation statute, not a safety statute. It is not designed to prevent the injury or assault of students when they leave the school; rather, it is designed to do just what it

17

says—provide free transportation for schoolchildren who live more than a mile away from the school. "Louisiana has a long-standing recognition of the right of elementary and secondary students and their parents to a free education and that included within that concept is the right to free transportation to and from school." *Moreau v. Avoyelles Parish Sch. Bd.*, 04-1613, p. 4 (La.App. 3 Cir. 3/9/05), 897 So.2d 875, 880, *writs denied* 05-910 (La. 6/17/05), 904 So.2d 704 and 05-997 (La. 6/17/05), 904 So.2d 705.

In asserting liability under this statute, Judge Cooks and Judge Saunders rely on the first paragraph of the statute and ignore a subsequent provision in the statute, which makes it clear that the penalty for violation of the duty imposed is not one in tort, but reimbursement to the parents of the child denied bus transportation for the expenses of alternate transportation. La.R.S.17:158(C). Even then, the reimbursement is not to exceed $125.00 per student, or $350.00 per family. *Id.* Furthermore, while the statute does not specifically say as much, its purpose is to provide transportation to and from school before and after regular school hours. This interpretation is supported by other statutory provisions. For example, the legislature has specified that a school is not required to provide transportation for students who have been reassigned to attend a different school after being accused of battery or assault on any school employee, La.R.S. 17:416(1)(vii)(dd), or for students who have been suspended or expelled from school and reassigned to an alternative education program, La.R.S. 17:416.2(E), if providing transportation for the pupil will result in additional costs to the school system.

Were Judges Cooks' and Saunders' interpretation of La.R.S. 17:158 to stand, school boards would be required to mandate that all students living more than one mile

from school ride the school buses provided or find themselves liable for every accident that might occur between home and the school. This would make all school boards the insurer of the safety of children between home and school—a duty clearly rejected by the supreme court in *Wallmuth*, 813 So.2d 341. Of greater concern is that Judge Cooks and Judge Saunders do not limit their opinions to mandated after-school activities. Instead, they would require school boards to provide transportation for all students participating in after-school activities, mandated or voluntary, or else somehow ensure the students have "an alternate safe means of getting home." Such an approach was rejected by this court in *Domingue,* 879 So.2d at 295, wherein it considered that under the facts of that case, it doubted that "anything short of an impossible system, that would require a roll-call of every student exiting the school, taking into account students who may have left school earlier in the day and who are involved in an ever-changing series of after-school events, would have been an effective deterrent" to preventing a student from being injured on his walk home.[11]

The record establishes that the Lafayette Middle School adhered to its policy of making sure that no child would be left on campus by having telephone access, making available other means of transportation, and by providing an on-campus procedure to make sure that everyone has left the campus before locking it down. The trial court considered the evidence presented to it, made credibility determinations, and concluded that the School Board, through its agents at the Lafayette Middle School, did not violate the reasonable supervision duty it owed to C.C. I agree with that judgment and would end the litigation at this point, finding no breach of duty.

---

[11]As previously stated, *Domingue,* 879 So.2d at 295, was the case where this court held that the duty of reasonable supervision does not include preventing an eleven-year-old sixth grade student who is supposed to ride the bus from walking home.

However, I find it necessary to address the other issues raised by the various plurality opinions.

### *Duty-Risk Analysis*

After the plurality failed to apply the manifest error standard of review, it confounded this error by ignoring the duty-risk analysis. In fact, even assuming that the School Board breached a duty by prohibiting C.C. from riding the tutoring students' bus (an assumption not supported by the record), that fact alone does not end the inquiry. The next step in the duty/risk analysis is to determine whether that breach was a cause-in-fact of her resulting harm—a step which the plurality never addressed.

Judge Saunders' decision begins and ends with the analysis of the application of La.R.S. 17:158. Had Judge Cooks and Judge Gremillion applied the duty-risk analysis on a step-by-step basis, I believe they would have reached a different conclusion. The record is clear that the action or inaction of the school officials at Lafayette Middle School was not a cause-in-fact of whatever harm C.C. may have incurred on her way home. The simple fact is that C.C. had no intention of telephoning her mother or seeking transportation at school. As her own testimony establishes, long before the Behavior Clinic was over she had already decided to go to Popeyes with S.R.C. when released from school. The following testimony by C.C. makes her plans crystal clear:

> Q    When did you find out that [S.R.C.] was not taking the school bus?
> C.C.   When we were in B.C. [Behavior Clinic].
> Q    What did she tell you?
> C.C.   She said she was going to Popeyes and then taking a bus.
> Q    She was going to catch the City bus from Popeyes?
> C.C.   Yes.
> Q    Was it then that you decided to go with her?
> C.C.   Yes.
> Q    Y'all are in B.C. and you decide: I'm going to go home with her and go to Popeye's anyway.

C.C.  I decided to ask her how she was gonna get home and she told me that - - she asked me if I could walk with her and I said "Okay."

Q     And that was in the B.C. class?

C.C.  Yes.

Q     Before it was over?

C.C.  Yes.

Judge Cooks suggests in a footnote that "[a]lthough the Board argues that the girls devised a plan earlier in that day to walk home from school there is no evidence in the record to support this position." While other testimony by C.C. attempts to modify the testimony cited above, it is incorrect to say that the record is devoid of evidence on this point. Judge Gremillion's concurrence falls into the same error, stating "[t]his is not . . . a case where this young lady simply chose to walk home instead of riding the school bus." In making this conclusory statement, he ignores the record before us.

Other testimony from C.C. supports a finding that C.C. had no intention of riding the bus or calling her mother. For example, C.C. testified that she did not remind her mother that she had Behavior Clinic when she left for school on the morning of November 4, 2004, because she assumed her mother had received the automated telephone call the night before. However, C.C. also testified that her mother did not receive a phone call from the school that night. At still another point she testified that on the two other times she had attended the Behavior Clinic, she used a friend's cell phone to call her mother from school and tell her mother that she had the Behavior Clinic and needed to be picked up. Further, she testified that when the Behavior Clinic let out at the end of the day, she immediately went to the office to call her mother without even checking outside to see if she was present. This certainly raises a question of why she needed to use the telephone without knowing whether or not her mother was present. Additionally, after she allegedly found the office door

21

locked (a fact disputed by everyone else who testified on this point) and requested to use Ms. Reed's cellular telephone (a fact disputed by Ms. Reed), she immediately joined S.R.C. and left the campus. Finally, she acknowledged that she had used the office telephone in the past, and that it had always been available.

Again, a proper application of the manifest error standard of review at this point would require that we affirm the trial court judgment without going further. That is to say, the plaintiff failed to prove that any breach of its duty by the School Board was a cause-in-fact of C.C.'s alleged injuries. *Lemann*, 923 So.2d 627.

### *Proof of a Tortious Act*

The trial court did not reach the rape issue because of its conclusion that the School Board breached no duty owed to C.C. However, the trial court gave us some guidance concerning its leanings on this issue when it stated in the reasons for judgment that "the testimony of Deputy Lebreton along with other factors does provide evidence to support" a finding contrary to C.C.'s rape allegations. The plurality opinions do not even consider the evidence on this critical element of proof. They simply ignore the record and assume that the sexual assault occurred as testified to by C.C.

I must agree with the trial court that the plaintiff did not establish that C.C. was sexually assaulted.[12] The problem with the proof presented on this issue is that C.C. articulated four different versions of what occurred.

Her first version was told to Lafayette City Police Officer and Juvenile Crimes Investigator Guy Joseph Lebreton, who investigated C.C.'s complaint. He was

---

[12]This conclusion should not be construed as a belief on my part that a crime was not committed. Sexual intercourse involving C.C., with or without her consent, is a criminal offense. Still, not every sexual encounter involving C.C. would cause the School Board to incur liability.

dispatched to the hospital on the evening of November 4, 2004, after the initial responding officer determined the nature of the alleged offense. According to Officer Lebreton, when he first spoke with C.C., she told him that a man came up behind her, choked her, and pulled her into a wooded area where she "fell asleep"— a comment which he interpreted to mean that she was choked unconscious. She then informed him that she awoke fully clothed and with her books and belongings beside her. According to Officer Lebreton, C.C. said that she told her grandmother first, and then her mother.[13]

Officer Lebreton found C.C.'s attitude during the initial interview to be "very unusual as far as trauma victims go," in that she seemed very unconcerned with what had happened. He also found it strange that C.C. was "smiling" during the vaginal examination by the emergency room physician. Additionally, although C.C. had told him that she had been choked and had been punched twice by her assailant, he observed no injury whatsoever to her face and neck. Furthermore, while he would have expected to see grass stains or rips on her clothing, the clothing reflected no signs of a struggle. Officer Lebreton then traveled to the location of the alleged assault, found no signs of a struggle, and, in fact, found no wooded area.[14]

The second version of the alleged assault was given to Officer Lebreton the next day, when he met with C.C. and her mother at the Lafayette City Police station. He again observed no bruises or abrasions on C.C.'s face or neck that could be considered evidence of a struggle. C.C.'s description of her assailant changed drastically in this interview and, when asked how she could explain having awakened fully clothed, C.C.

---

[13]The plaintiff testified that when C.C. told her of the incident, she (the plaintiff) telephoned the grandmother.

[14]The closest thing to a wooded area observed by Officer Lebreton was a line of bushes along a fence with a clearance of approximately two to three feet between the bushes and the fence.

changed her story to say that she was undressed and had put her clothes back on. When Officer Lebreton commented about the lack of bruises, C.C. then stated that she had been approached by a male in a vehicle, abducted, and thrown in the back seat of the vehicle. Later in the interview, C.C. told the officer that she had been raped in a motel room several blocks from the initial crime scene, not in the wooded area as originally stated.

At some point in the investigation, C.C. told Officer Lebreton that she knew her assailant frequently stayed at the motel and that on the morning of November 4, 2004, she had seen him at the car wash near where she claimed to have been abducted. Officer Lebreton suggested that this knowledge raised "kind of flags for me because now she's providing knowledge about his social habits and where he hangs out and where he stays at night. Uncommon for a, you know, anonymous victim, anonymous suspect relationship." Officer Lebreton went to the motel and inspected the registration logs for the day of the incident as well as prior days and found no information to support C.C.'s story.

After two photographic lineups proved unhelpful, Officer Lebreton pressed C.C. for other information. C.C. continued to say that she was taken to the motel, but provided the officer with the name of "Curt or Curtis," who she claimed was known to her aunt, who drove a white vehicle, and who frequented a homeless shelter on the opposite side of Lafayette. The officer spoke with the aunt, who denied any knowledge of such a person.

At this point in the investigation, Officer Lebreton began to suspect that C.C. had a relationship with the person with whom she had sex. He met with S.J. and informed her that he could do nothing more until she and C.C. were able to "come to

24

some terms about what happened and present it to me up front and honestly." When nothing new arose within the next two weeks, he suspended the investigation. This occurred in the latter part of November of 2004, and no one was ever charged with the alleged sexual assault.

S.R.C. testified to a third version of the encounter. She testified that C.C. told her that "somebody had attacked her into a ditch and hit her upside the head with a brick." S.R.C. added other food for thought when she testified that C.C. had a "boyfriend" although she did not know his name. Additionally, she testified that C.C. never explained what or who she was waiting for when S.R.C. left C.C. at Popeyes.

C.C. testified at trial to a fourth version: that she was grabbed on the street within two minutes of leaving Popeyes by a man who approached her from the front as he walked toward her on the sidewalk adjacent to the street. She testified that she and her assailant then engaged in a fist fight as she struggled to get away, and that he ultimately knocked her unconscious. She then testified that when she awoke, she found herself in the nearby woods with her clothes from her waist down removed. Realizing that she had been raped, she returned to the street, retrieved her purse and books, which were still lying next to the street, and walked home. When she arrived at home, she informed her mother that she had been raped and her mother telephoned the police. According to C.C., the other injury she sustained in addition to the rape and its consequences was a black eye.

Even assuming a breach of duty by the School Board, not every sexual encounter would cause the School Board liability. It was the plaintiff's burden to prove that C.C. was sexually assaulted and the nature of that sexual assault. While C.C. may have been the victim of a sexual assault, the different versions of what

occurred, as provided by C.C., did not reach the threshold of proof by a preponderance of the evidence. The plaintiff's failure to prove by a preponderance of the evidence the actual nature of the sexual encounter also results in a failure to prove an element of the duty-risk analysis and mandates a determination of no liability on the School Board's part. *Lemann*, 923 So.2d 627.

### *Areas of Disagreement in the Legal Analysis of the Plurality*

I have already addressed my disagreement with Judge Cooks' and Judge Gremillion's reliance on *D.C. v. St. Landry Parish School Board*, 802 So.2d 19, as well as Judge Cooks' and Judge Saunders' reliance on La.R.S. 17:158. The other principle disagreement I have with the plurality's legal analysis centers around Judge Cooks' reliance on the supreme court's prior decision in this matter as reported as *S.J. v. Lafayette Parish School Board*, 06-2862 (La. 6/29/07), 959 So.2d 884. In citing this opinion, Judge Cooks quotes the factual statements made in Justice Johnson's concurring opinion as if these facts had been established after a trial. Justice Johnson was not faced with a factual record based on a trial on the merits when she rendered her opinion, but was reviewing issues raised by a motion for summary judgment. When a reviewing court considers a district court's grant of summary judgment, it must view the record and all reasonable inferences that may be drawn from that record in the light most favorable to the non-movant—in this case, the plaintiff. *Hines v. Garrett*, 04-806 (La. 6/25/04), 876 So.2d 764. "In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor." *Id.* at 765. Thus, it was appropriate for the supreme court, when reviewing the trial court's

26

grant of summary judgment in favor of the School Board, to accept as true all the allegations in S.J.'s petition, without weighing the limited evidence then before it.

While Justice Johnson begins her concurring opinion[15] by titling the first section therein as "***FACTS AND PROCEDURAL HISTORY***," she made it clear that credibility calls are not appropriate in a summary judgment analysis, and concluded that summary judgment in this matter was not appropriate because there were genuine issues of material fact remaining in the litigation. The matter is now before us after a trial on the merits and the prior supreme court holding in this matter is of no help in our analysis because the standard of review has changed. We are now bound by the manifest error standard and must give great deference to the trial court because it, after hearing all of the evidence and observing the demeanor of the witnesses, was in the best position to determine the credibility of the various witnesses and what weight should be given to their testimony. It made those determinations, obviously choosing to discredit C.C.'s uncorroborated testimony and instead believe the testimony given by all the other witnesses at trial.

**SUMMARY**

The plurality's positions on the legal and factual issues are not unanimous, and a summary of the various positions make that extremely clear.

- Judges Saunders and Gremillion recognize the School Board's duty as that of reasonable supervision while Judge Cooks suggests that in this case, the School Board has an enhanced duty of supervision.

---

[15]It bears noting that the opinion was not unanimous. It was released as a five-judge *per curiam* opinion, with [now] Chief Justice Kimball, Justice Johnson, Justice Traylor, and Justice Weimer forming the majority. Chief Justice Kimball and Justice Traylor joined in the written reasons authored by Justice Weimer, and Justice Johnson wrote separately. Justice Knoll dissented with reasons, and Justice Victory dissented without reasons.

27

- Judges Saunders and Gremillion agree that there is no manifest error in the trial court's factual finding that a telephone was available to C.C. at school. Judge Cooks concludes otherwise.

- Judges Cooks and Saunders conclude that the School Board's failure to provide school bus transportation to C.C. after Behavior Clinic violates the requirements of La.R.S. 17:158, thereby creating a cause of action in tort. Judge Gremillion disagrees with this conclusion. None of the three even consider the trial court's factual determination that other transportation was available to C.C.

- Judges Saunders and Gremillion agree as to quantum and the percentages of fault while Judge Cooks disagrees. Judge Cooks would award significantly more in damages and would decrease C.C.'s degree of fault.

- All three ignore the manifest error standard of review and fail to perform a duty-risk analysis, particularly in relation to cause-in-fact.

This case is not complicated. The principal issue is whether the trial court correctly found that the School Board did not breach its duty of reasonable supervision and I find no error, legal or factual, in the trial court's determination. I would affirm.

28

**GREMILLION, Judge, concurs in the result and assigns written reasons.**

This is a very difficult and troubling case. In my view, the school board does bear some liability here. However, I am also forced to admit that there are, indeed, certain facts and jurisprudence that mitigate against that conclusion.

First and foremost, the rape took place more than an hour after school and more than a mile from school. If a bright line rule existed in terms of how far the school board's duty extends temporally and spatially, an "hour/mile rule" would probably be it. Furthermore, it is clear that C. C. deviated on her walk home in order to go to Popeye's restaurant.

In addition to these facts regarding time and space, I also agree with the trial court's conclusion that this twelve-year-old girl certainly had access to at least one telephone before she left the school grounds. There is no one to blame but her for her failure to call someone.

I also take issue with the scope of the school board's duty that has been suggested by the majority opinion, and as well as Judge Saunders' concurring opinion. Specifically, framing the school board's duty using La.R.S. 17:158(A)(1) is incorrect and greatly expands the duty beyond what is reasonable. The suggestion is that because the school board is obligated to provide "free transportation to any student," the school board would be responsible for any injury sustained by "any student" when those injuries would not have been sustained if the injured student had

1

taken a school bus home. This is not the law. The school board is not the "insurer of the safety of the children," and "constant supervision of all students is not possible nor required." *Wallmuth v. Rapides Parish School Board*, 01-1779, 01-1780, p. 8 (La. 4/2/02), 813 So.2d 341, 346. More specifically, the school board's duty does not, for example, extend to preventing a student who is supposed to ride the bus from walking home if he or she chooses to do so. *Domingue v. Lafayette Parish School Board*, 03-895 (La.App. 3 Cir. 2004), 879 So.2d 288, *writ denied*, 04-1803 (La. 10/29/04), 885 So.2d 588. Rather, the school board's duty is simply to provide adequate or reasonable supervision. *Walmuth, Id.* and *Domingue, Id.*

Ultimately, I concur with the majority's result because I believe the school did not provide reasonable supervision. This is not, as in *Domingue*, a case where this young lady simply chose to walk home instead of riding the school bus. The facts clearly establish that she was told she could not take the bus. Furthermore, it is clear to me that the school's policy was to intentionally withhold a safe and convenient ride home as a means of punishing bad behavior. If C. C. had been held after school for some sort of tutoring, practice or other extra curricular activity, she would have been permitted to take the bus home. However, according to the "facilitator" of the behavior discipline center, because this child was after school for "behavior clinic" to provide her with a "free ride home," and consequently keep her safe from grievous bodily harm was a "luxury" to which she was not entitled.

The school board does not have a duty to provide all students with a safe and convenient ride home. However, when such a ride is otherwise available, and the school actively takes steps to prevent a child from taking this safe and convenient ride

2

home, it has clearly breached its duty to appropriately supervise the children within its care.

Our opinion in *D.C. v. St. Landry Parish School Board*, 00-1304 (La.App. 3 Cir. 3/7/01), 802 So.2d 19, *writ denied*, 01-981 (La. 5/25/01), 793 So.2d 169, is instructive. Therein, the child involved had violated the dress code. She was told she had to go home and change her clothes. Thus, when she was unable to secure a ride home, she was placed in the position of having to walk home through a dangerous neighborhood. This court found the school board at fault, saying that the school's duty to reasonably supervise children "certainly included" the duty to make the appropriate supervisory decisions concerning a student's departure from campus. . . ."[1] *Id.* at 23.

In summary, the school board does not have a duty to prevent harm to students by requiring all of them to take the bus home. Rather, the school board has a general duty to reasonably supervise the children in its care. Within that general duty is a more specific duty to make appropriate departure decisions. Here, the school board decided to punish this little girl by denying her the "luxury" of a safe and convenient ride home. In my view, that was an exceedingly bad "departure decision." As in the *D. C.* case, it put C. C. in the position of having to walk home through a dangerous neighborhood wherein she was attacked. Therefore, I concur in the result. The Lafayette Parish School Board is 20% at fault in causing the injuries to this minor child. I also concur in the damages awarded.

---

[1]It should be noted that this opinion limited the school's duty to make appropriate departure decisions to "regular school hours." However, it is also true that the school board's general supervision duty is owed when a child is participating in after school activities sanctioned by the board. *Jackson v. Colvin*, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, *writ denied*, 99-228 (La. 3/19/99), 740 So.2d 117. If this duty is owed when the child is participating in an after school activity that is merely "sanctioned" by the board, then, for a greater reason, the duty is owed when the child is at school after hours in an activity that is mandated by the board.